Andrew R. Wolf, Esq. (NJ Attorney ID No. 018621995)
Javier L. Merino, Esq., (NJ Attorney ID No. 078112014)
Henry P. Wolfe, Esq. (NJ Attorney ID No. 031942005)
**THE DANN LAW FIRM PC**
825 Georges Road, 2nd Floor
North Brunswick, NJ 08902
Phone: (732) 545-7900
Fax: (216) 373-0536
Email: notices@dannlaw.com

**THE LAW OFFICE OF AARON HARMATY, LLC.**
Aaron M. Harmaty, Esq., # 301832019
21 Van Doren Ave.
Chatham, NJ 07928
973-309-5492
aharmatylaw@gmail.com
Counsel for Plaintiffs and those similarly situated

| | |
|---|---|
| EUGENE MCCLURE AND ANNA MAE MCCLURE<br><br>Plaintiffs,<br><br>v.<br><br>CAMPERS INN RV OF SEWELL, INC. d/b/a/ DYLANS RV CENTER, JEFFREY M. HIRSCH, BENJAMIN HIRSCH, MATT JEPPSEN, JACOB HELMS, and ANDY PANDOLFI,<br><br>Defendants. | UNITED STATES DISTRICT COURT FOR THE DISTICT OF NEW JERSEY<br><br>Case No.: 1-cv-25-17313-KMW-EAP<br><br>Civil Action<br><br>**FIRST AMEMDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiffs, Eugene McClure and Anna Mae McClure ("Plaintiffs" or "McClures"), on behalf of themselves and those similarly situated, by way of their First Amended Complaint, state:

## NATURE OF THE ACTION

1. This putative consumer class action arises from standard business practices by Campers Inn RV of Sewell, Inc., d/b/a Dylans RV Center ("Dylans"), Jeffrey M. Hirsch, ("JMH"), Benjamin Hirsch, ("BH"), Matt Jeppsen, ("Jeppsen"), and Jacob Helms ("Helms") collectively

Dylans, JMH, BH, Jeppsen and Helms are referred to as (the "Defendants") which violate New Jersey consumer protection laws and regulations, including the New Jersey Motor Vehicle Advertising Practices Regulations ("MVAP Regulations") at N.J.A.C. 13:45A-26A.4(a), the New Jersey Automotive Sales Practices Regulations (the "ASP Regulations"), N.J.A.C. 13:45A-26B.1 et seq., the New Jersey Consumer Fraud Act (the "CFA"), N.J.S.A. 56:8-1 et seq., and the New Jersey Truth-in-Consumer Contract, Warranty, and Notice Act ("TCCWNA"), N.J.S.A. 56:12-14, to -18.

2. Defendants engage in a common pattern and practice of charging customers a vehicle sales price for recreational vehicles ("RVs") that is in excess of the advertised price in violation of the MVAP Regulations at N.J.A.C. 13:45A-26A.4(a) and/or that includes an unitemized pre-delivery service fee in violation of the ASP Regulations at N.J.A.C. 13:45A-26B.2(a)(2), and the CFA.

3. Defendants engage in a common pattern and practice of charging customers an unitemized documentary fee and thus fail to comply with the ASP Regulations at N.J.A.C. 13:45A-26B.3(a)(2), and the CFA.

4. Defendants engage in a common pattern and practice of overcharging customers for official title and registration fees and failing to timely refund the entire amount of the overcharge. This overcharge constitutes an unitemized documentary service fee in violation of the ASP Regulations at N.J.A.C. 13:45A-26B.3(a)(2).

5. Defendants' violations of the ASP Regulations, MVAP regulations and CFA on the face of the sales documents also constitute violations of the TCCWNA.

6. The McClures also bring individual claims against Defendants for selling the McClures a defective 2025 260DS Ford MC Leprechaun RV with an active recall and refusing to take back the defective RV as set forth *infra*.

**PARTIES**

7. The McClures are a married couple in their 60s who reside in Vineland, New Jersey.

8. Dylans is a New Jersey Domestic Profit Corporation that does business at an RV dealership located at 2190 Delsea Dr., Sewell, NJ 08080.

9. Dylans is a licensed motor vehicle dealer with the New Jersey Motor Vehicle Commission.

10. Defendant JMH is a controlling owner and Chief Executive Officer of Dylans.

11. Defendant BH is a controlling owner and Chief Operating Officer of Dylans.

12. Defendant Jeppsen is a controlling owner and Chief Financial Officer of Dylans.

13. Defendant Helms has been a manager at Dylans at all times relevant to this action.

14. Defendant Andy is a sales representative and agent for Dylans and as the sales representative who engaged with the McClures at all relevant times and is directly liable to the McClures for his unlawful acts pursuant to the CFA, at N.J.S.A. 56:8-2. “Defendants” when referring to The McClures’ individual claims also includes Andy.

15. N.J.A.C. 13:21-15.7(c) states: “The dealer, all partners, officers, directors and/or holders of controlling interests shall be individually responsible for the conduct of all business at the dealership and for compliance with all the requirements of the statutes and rules governing the business of buying, selling or dealing in motor vehicles.”

16. As controlling owners, officers, or directors of Dylans, JMH, BH and Jeppsen are individually liable for the violations of the MVAP Regulations, ASP Regulations, CFA, and TCCWNA set forth herein pursuant to N.J.A.C. 13:21-15.7.

17. JMH, BH, Jeppsen and Helms set the policies and practices of Dylans, including, without limitation, the policy and practice of regularly charging more for RVs than their advertised prices in violation of the MVAP Regulations, the policy and practice of charging a vehicle sales price for RVs that includes unitemized pre-delivery service fees in violation of the ASP, the policy and practice of charging unitemized documentary service fees in connection with RV sales in violation of the ASP Regulations, and the policy and practice of overstating and overcharging customers for MVC title and registration fees without providing a full refund of the amount overcharged, in violation of the ASP Regulations and CFA.

18. As managers, directors, officers, or controlling owners of Dylans who set the policies and practices complained of herein, JMH, BH, Jeppsen and Helms are personally liable for all claims set forth herein. See *Allen v. V & A Bros., Inc.*, 208 N.J. 114, 132-134 (2011).

**<u>JURISDICTION and VENUE</u>**

19. The McClures initially filed the Complaint in this action in the Superior Court of New Jersey on October 9, 2025 under Docket No.: CUM-L-708-25.

20. On November 7, 2025 the Defendants removed this matter to the United States District Court – District of New Jersey under Case No.: 1:25-cv-17313.

21. The removal was based on federal question jurisdiction pursuant to 28 U.S.C. § 1331, as the original Complaint asserted a claim under the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq*.

22. This Amended Complaint withdraws the former claim under the Truth in Lending Act and asserts no other claims under federal law.

23. Since there is no longer federal question jurisdiction this matter should be remanded

pursuant to 15 U.S.C. 1601 to the Superior Court of New Jersey, Cumberland County. See *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025)("When a plaintiff amends her complaint following her suit's removal [and] eliminates the federal-law claims that enabled removal, leaving only state-law claims behind, the court's power to decide the dispute dissolves" requiring remand.)

24. Venue is proper in Superior Court of New Jersey, Cumberland County because the McClures reside in Cumberland County.

**STATEMENT OF FACTS**

25. On August 5, 2025, the McClures went to Dylans' location to look at a recreational vehicle, as the McClures enjoyed camping in a camper but wanted a more compact vehicle.

26. Andy, a Dylans' salesman, approached the McClures, and after discussing their purpose and preferences, recommended and showed them a 2025 Coachmen Leprechaun 260DS" RV ("the RV").

27. Andy represented to the McClures that the RV was a "top of the line" recreational vehicle; that it was new, better built, and better than earlier models.

28. However, Andy failed to disclose to the McClures that by August 5, 2025, the dealership had received recall notice from the manufacturer applicable to the 2025 Coachmen Leprechaun 260DS line of vehicles, including the RV shown to the McClures, advising that "[t]he fuel line extension may have been inconsistent crimps at the barb fittings of its connectors which can cause the fittings to become loose and detach" and "[i]f a fuel line detaches, this may allow fuel to openly spray. This condition may lead to fire and property damage." A copy of the recall notice is attached as **Exhibit A.**

29. The recall notice also advised that "[p]arts are not currently available for this recall." and "if you have already paid for a repair that is within the scope of this defect under recall,

you still need to have this recall inspected and/or performed to ensure the correct parts and procedures were utilized." *Id.*

30. Mr. McClure initially stated he wanted to "sleep on it" with regards to making a purchase decision. However, based on Andy's representations as to the condition and quality of the RV, the McClures went to speak to Dylans' business manager, Helms.

31. Helms convinced the McClures to purchase the RV on August 5, 2025 and also sold the McClures several additional items, such as a Vehicle Service Contract, GAP, Paint Protection, Roadside Assistance and Tire and Wheel Protection. The total prices of the additional items were in excess of $19,000.00.

32. The final RV purchase price, not including the cost of financing, was $160,695.90.

33. At no point did Andy, Helms, or anyone else at Dylans disclose to the McClures the fuel line issue in the recall notice or that there was a pending recall on the RV.

34. The McClures made down payment towards the RV of $15,000 ($5,000 via credit card and a check for $10,000).

35. The McClures financed the balance of the RV purchase ($145,695.90) through Dylans' by agreeing to a 240-month loan that would cost a total of $292,260.00, including a $145,564.10 Finance Charge.

36. The final RV purchase price, including the down payment and the cost of financing, was $307,260.00.

37. At the time of purchase, Mr. McClure expressed concern to Helms about the price and duration of the loan, and Mr. McClure likened it to purchasing a house.

38. Helms stated that if the costs became too much, or the McClures got tired of the purchase, they could just stop making payments on it and M&T Bank (the entity who would be assigned the loan after purchase) would pick up the RV without any risk to the McClures. Helms assured Mr. McClure that nonpayment of the loan would not have any negative impact on the McClures.

39. Mr. McClure asked Helms to clarify that the he meant that that M&T would not pursue payment against the McClures or their family if they did not continue paying the loan and turned in the RV, and Helms re-affirmed that M&T Bank would not pursue them for the loan if they defaulted.

40. At no point in the August 5, 2025 meeting, did Helms or anyone else at Dylan's mention the recall notice to the McClures.

41. The McClures relied on Andy's representations regarding the quality of the RV in deciding to purchase it on August 5, 2025.

42. The McClures relied on the lack of disclosure of that the RV was subject to a pending recall, and the lack of disclosure of the other information contained in the recall notice in their decision to purchase the RV on August 5, 2025.

43. The McClures relied on Helms' representations regarding how the loan would function when deciding t0 purchase the RV and agree to the financing on August 5, 2025.

44. On August 5, 2025, the McClures were presented with and signed a sales document called a Buyer's Order ("BO"). A copy of the BO is attached as **Exhibit B**.

45. The BO categorized certain items included in the total price of $160,695.90 including:

| | |
|---|---|
| Vehicle Sales Price | $130,895.00 |
| Certificate of Title Fee | $450.00 |

| | |
|---|---|
| Documentation Fee Paid to Seller | $399.00 |

46. On August 5, 2025, the McClures were presented with and signed a Retail Installment and Security Agreement ('RISC"). A copy of the RISC is attached as **Exhibit C**.

47. The RISC categorized certain items included in the amount financed that were the same as the charges on the BO including:

| | |
|---|---|
| Vehicle Sales Price | $130,895.00 |
| Certificate of Title Fee | $450.00 |
| Documentation Fee Paid to Seller | $399.00 |

48. The RISC also stated in a section entitled "11. Notices" which stated in relevant part:

> 11.2 Documentary Service and Pre-Delivery Service, A Documentary Service fee and Pre-Delivery Service fee are not official fees and are not required by law. "Documentary service" means, but is not limited to, the preparation and processing of documents in connection with the transfer of license plates, registration, or title, and the preparation and processing of other documents relating to the sale of a motor vehicle, Documentary Service Fees MUST BE ITEMIZED ABOVE such that the price of each prepared document is disclosed. "Pre-delivery service" means, but is not limited to, items that are often described or labeled as dealer preparation, vehicle preparation, pre-delivery handling and delivery, or any other service of similar import. Pre-Delivery Service Fees MUST BE ITEMIZED ABOVE and do not include any services for which the dealer receives compensation from any other party.

*See* Exh. C.

49. The McClures paid or were obligated to pay for the full purchase price of the RV including the Vehicle Sales Price, Certificate of Title Fee and Documentation Fee Paid to Seller.

50. The $399.00 Documentation Fee Paid to Seller is a documentary service fee as defined by the ASP Regulations at N.J.A.C. 13:45A-26B.1.

51. The BO fails to itemize the actual documentary services being provided for the "Documentation Fee Paid to Seller" and the price for each specific service being provided as required by the ASP regulations.

52. The BO is a "sales document" as defined by the ASP Regulations, N.J.A.C. 13:45A 26B.1, et seq.

53. The Documentation Fee Paid to Seller charged to the McClures and listed on the BO is a "documentary service fee" as defined by the ASP Regulations.

54. Defendants are "automotive dealers" as defined by the ASP Regulations at N.J.A.C. 13:45A-26B.1.

55. In the ordinary course of business, Defendants engage in the retail sales of motor vehicles, or offer more than three (3) motor vehicles for sale, lease, or rental in the course of any 12-month period relevant to this matter.

56. Pursuant to the ASP Regulations at N.J.A.C. 13:45A-26B.3(a)(2), Defendants shall not "accept, charge or obtain from a consumer monies, … in exchange for the performance of any documentary service without first itemizing the actual documentary service, which is being performed **and** setting forth in writing, … on the sale document the price for each specific documentary service." (emphasis added).

57. Pursuant to the ASP Regulations at N.J.A.C. 13:45A-26B.4 any violation of the ASP Regulations is a per se violation of the consumer Fraud Act ("CFA").

58. In addition to being a regulatory violation, the failure to itemize each service and price for each service is an abusive or unconscionable commercial practice, or other affirmative act in direct violation of the CFA at N.J.S.A. 56:8-2.

59. The McClures suffered an ascertainable loss of $399.00, which is the amount they were charged for documentary service fees that were prohibited and unlawful under the ASP Regulations and CFA.

60. Defendants failed to itemize the services being provided for the Documentary Service Fees so that the McClures and those similarly situated could understand what they were actually being charged for.

61. As a direct result of Defendants' unlawful conduct, The McClures and those similarly situated suffered an ascertainable loss in the amount of the unitemized "Documentation Fee Paid to Seller", or similar fee each was charged.

62. Through the BO, Defendants charged the McClures a "Certificate of Title Fee" of $450.00 to title and register the RV.

63. The actual official fees charged by the NJ MVC to title and register the RV were as follows: (a) $283.00 for the registration; (b) $85.00 title fee ($60.00) with a lien ($25.00); and (c) $5.50 for temporary registration, totaling $373.50, or $76.50 less than the $450.00 Defendants charged ($450.00 - $373.50).

64. Defendants issued a refund to the McClures of a portion of the overcharge for title and registration fees in the amount of $60.00.

65. After accounting for the $60.00 refund, Defendants overcharged the McClures for title and registration by $16.50 ($450.00-$373.50-$60.00).

66. Defendants did not refund the McClures the $16.50 overcharge.

67. The Defendants have adopted a policy/practice in the sale/lease of vehicles of overstating and collecting registration/title fees in excess of the official fees charged and remitted

to the appropriate Division of Motor Vehicles for timely registration and transfer of title without refunding all of the overcharges to its customers.

68. The overcharge for title and registration fees is a documentary service fee pursuant to the ASP Regulations at N.J.A.C. 13:45A-26B.1.

69. The ASP Regulations at N.J.A.C. 13:45A-26B.3(a)(2) prohibit the Defendants from charging any non-itemized documentary service fee including one hidden in a title and registration overcharge without itemizing the services being provided and the price for each service on the sales document.

70. The Defendants violated the ASP Regulations at N.J.A.C. 13:45A-26B.3(a)(2) by failing to itemize on the BO the services being provided and the price for reach service included in the title and registration overcharge.

71. In addition to being a regulatory violation, the failure to provide a complete refund and failure to itemize each service and price for each service in the amount charged in excess of the official fees to title and register a motor vehicle is an abusive or unconscionable commercial practice, or other affirmative act in direct violation of the CFA at N.J.S.A. 56:8-2.

72. The McClures and those similarly situated suffered an ascertainable loss in the amount each was charged in excess of the official fees to title and register their motor vehicle and not refunded. Plaintiffs' ascertainable loss is $16.50.

73. Prior to presenting the BO to the McClures and selling the RV with a vehicle sales price of $130,895.00, Defendants represented to the McClures that the actual sales price of the RV was $127,975.00.

74. The $127,975.00 sales price was presented to Plaintiffs in a Quote document prior to the sale. Copy of the Quote is attached as **Exhibit** D.

75. Defendants sold the RV to the McClures in an amount that was $2,920.00 more than the price represented prior to the sale.

76. The representation that the sales price was $127,975.00 in the Quote is an advertisement pursuant to the MVAP Regulations at N.J.A.C. 13:45A-26A.3 and the CFA at N.J.S.A. 56:8-1(a).

77. The MVAP Regulations at N.J.A.C. 13:45A-26A.4(a)(1) prohibits Defendants from the "advertis[ing] of a motor vehicle as part of a plan or scheme not to sell or lease it at the advertised price."

78. A "[r]efusal to show, display, sell, or lease the advertised motor vehicle in accordance with the terms of the advertisement" constitutes prima facie evidence of a bait-and-switch violation under N.J.A.C. 13:45A-26A.4(a)(2)(i).

79. The MVAP Regulations at N.J.A.C. 13:45A-26A.4(a) states that Bait and Switch advertising practices are an unlawful.

80. As alleged *supra*, Defendants sold the RV to the McClures for $2,920.00 more than the advertised price.

81. Alternatively, the $2,920.00 additional amount that Defendants included in the Vehicle Sales Price on the BO is an unitemized pre-delivery service fee that violated the ASP Regulations at N.J.A.C. 13:45A-26B.2.

82. The Quote states that the $2,920.00 consists of $1,675 for a "Camp-Ready Prep Package" and a $1,225.00 "Destination" fee.

83. The Quote does not include any itemization of the services or price for each service included in the Camp-Ready Prep Package or the Destination fee.

84. The ASP Regulations at N.J.A.C. 13:45A-26B.2 prohibits charging "any pre-delivery service fee without first itemizing the actual pre-delivery service, which is being performed and setting forth in writing, in at least 10-point type, on the sales document the price for each specific pre-delivery service."

85. The Quote is not a sales document.

86. Pursuant to N.J.A.C. 13:45A-26B.1, a "pre-delivery service" includes "but is not limited to, items that are often described or labeled as dealer preparation, vehicle preparation, pre-delivery handling and delivery, or any other service of similar import."

87. Pursuant to the ASP Regulations at N.J.A.C. 13:45A-26B.3(a)(2), Defendants shall not "accept, charge or obtain from a consumer monies, … in exchange for the performance of any documentary service without first itemizing the actual documentary service, which is being performed **and** setting forth in writing, … on the sale document the price for each specific documentary service." (emphasis added).

88. Defendants failed to itemize on the BO the services or the price for each service included in the additional $2,920.00 that the McClures were charged in the Vehicle Sales Price.

89. Pursuant to the ASP Regulations at N.J.A.C. 13:45A-26B.4 any violation of the ASP Regulations is a per se violation of the consumer Fraud Act ("CFA").

90. In addition to being regulatory violations, engaging Bait and Switch advertising practices or the failure to itemize each pre-delivery service and price for each pre-delivery service is an abusive or unconscionable commercial practice, or other affirmative act in direct violation of the CFA at N.J.S.A. 56:8-2.

91. As a result of Defendants unlawful practices of engaging in Bait and Switch advertising practices or charging unitemized pre-delivery service fees in violation of the consumer regulations and the CFA, the McClures suffered an ascertainable loss of $2,920.00.

92. Defendants engaged in similar unlawful conduct with numerous other consumers.

93. As a direct result of Defendants' unlawful conduct, the McClures and those similarly situated suffered an ascertainable loss in the amount of the increased price each was charged for to Bait and Switch advertising practices or unitemized pre-delivery service fee, or similar fee each was charged.

94. Before they were allowed to take the RV with them, the McClures were told that they would have to leave the RV at the Dylans' property so that they could prepare it for use including that as part of the warranty, they had to put a coating on the interior and exterior of the RV.

95. While waiting for the RV to be delivered, the McClures purchased several items to enhance the RV, such as approximately $2,000 in bedding, $300 for floor mats for the driving cab, $300 for a new door lock, and $5,000 for a carport for storing the RV out of the weather.

96. On Monday August 11, 2025, some or all of the Defendants had actual notice of the recall notice on the RV.

97. On Monday August 11, 2025, six days after purchase, the McClures returned to the dealership to take delivery and pick up the RV.

98. On August 11, 2025, the McClures were given a walkthrough of the RV by representatives of Dylans being shown how to use various devices in the RV.

99. At no point on August 11, 2025, during the walkthrough or otherwise were the McClures advised of the Recall Notice or the issues involving the recall notice prior to delivering the RV to them.

100. After the McClures took delivery of the RV, they found that the slide-out was crooked.

101. The McClures brought the RV back to Dylans the next day, August 12, 2025 to fix the slide-out.

102. One of the mechanics at Dylans told the McClures to purchase two additional motors, to replace the motor in the slide outs as needed, as apparently the motor on the vehicle was known to break down.

103. Prior to this conversation, the McClures were not told about the issue involving the motor breakdown.

104. At no time on August 12, 2025 did anyone advise the McClures about the recall issue.

105. The mechanics fixed the slide out, and the McClures took the RV home.

106. The McClures spent approximately $300 to purchase a door lock to fix the lock for the RV.

107. There was also an issue with the external television, which the McClures brought to the mechanic at the dealership who fixed it.

108. At that time, they were also not alerted to the issue involving the recall notice.

109. That same week, the generator stopped functioning, so the McClures brought the RV back to Dylans.

110. When they brought the vehicle back to Dylans, the Dylans mechanic stated that the generator was not working because a part was missing, and the mechanic said he would take the part from another vehicle in order to make it work.

111. The McClures were not told about the recall issue at this time.

112. After that visit to the dealership, the vehicle's generator worked.

113. Approximately a week later, the McClures received the recall notice directly from Forest River, the manufacturer of the RV. A copy of the recall notice is attached as **Exhibit A.**

114. Upon receiving the recall notice, the McClures called Helms, seeking to return the RV.

115. Helms refused to accept the return of the RV.

116. Thereafter, the McClures contacted Forest River about the recall notice.

117. The representative of Forest River advised that the recall notice should have arrived at the dealership on or before August 5, 2025, the same day that the McClures purchased the RV.

118. The McClures have kept the RV on their property and have not used it, as it is unsafe to drive.

119. The McClures have maintained the RV by winterizing it and have continued to pay for insurance and the monthly payments while being unable to use it due to its unsafe condition.

## CLASS CERTIFICATION ALLEGATIONS

120. **Class Definition:** Plaintiffs bring this action pursuant to R. 4:32 of the New Jersey Court Rules on behalf of a class of those similarly situated. Plaintiffs seek certification of a class (the "Class") pursuant to R. 4:32-1(b)(2) and (b)(3) initially defined as follows:

> All persons who, at any time on or after October 9, 2019 who purchased or leased a Recreational Vehicle from Defendants who: (1) received a sales document with terms the same or similar to the terms in the BO provided to Plaintiffs; (2) were charged a "Documentation Fee Paid to Seller" or a similar

fee for documentary services where the sales document used in the transaction did not set forth in writing each specific documentary service performed and the price for each service; (3) were charged a "Certificate of Title Fee" or similar fee to title and register the vehicle purchased or leased that exceeded the actual official fees charged by the New Jersey MVC and/or the appropriate Motor Vehicle agency of the state where the vehicle was registered to timely register and title the vehicle purchased or leased and who did not receive complete refunds for the overcharge; /or (3) were charged a "Vehicle Sales Price" that was more than the advertised price for the RV or included a pre-delivery service fee, prep fee or a similar fee for pre-delivery services where the sales document used in the transaction did not set forth in writing each specific pre-delivery service performed and the price for each service .

Specifically excluded from the Class are any judges or magistrates involved in this matter.

121. With regards to the Class definition *supra*, "terms the same or similar" means a sales document similar to the one received by the McClures that contains similar language as the form BO used in their transaction.

122. The members of the proposed Class are so numerous that joinder of all members of the class is impracticable as the Defendants sold or leased more than 50 Recreational Vehicles during the class period using the same or similar sales document as used in the McClures' transaction.

123. There are questions of law and fact common to the members of the Class. These common questions include:

(a) Whether the "Documentation Fee Paid to Seller" is a documentary service fee pursuant to the ASP Regulations, N.J.A.C. 13:45A-26B.1;

(b) Whether the Defendants charging Plaintiffs and those similarly situated for a "Documentation Fee Paid to Seller" without itemizing each service provided and the price for each service constitutes an unitemized documentary fee charged in violation of the ASP Regulations, N.J.A.C. 13:45A-26B.3(a)(2) and CFA;

(c) Whether the Defendants have a policy or practice of charging Plaintiffs and those similarly situated for a "Certificate of Title Fee" or similar title and registration charge in excess of

the official fees to title and register the RVs without providing a full and accurate refund of the amount overcharged;

(d) Whether the "Certificate of Title Fee" overcharge is a "Documentary Fee" as per the ASP Regulations, N.J.A.C. 13:45A-26B.3(a)(2);

(e) Whether Defendants have a policy or practice of charging Plaintiffs and those similarly situated a "Certificate of Title Fee" or similar charge for documentary services without itemizing the documentary services being performed and the price for each pursuant to the ASP Regulations, at N.J.A.C. 13:45A-26B.1, *et seq*.;

(f) Whether Defendants charging Plaintiffs and those similarly situated "Certificate of Title Fee" and failing to itemize documentary services violates the ASP Regulations and the CFA;

(g) Whether Defendants have a policy or practice of charging Plaintiffs and those similarly situated a Vehicle Sales Price in excess of the advertised price.

(h) Whether charging Plaintiffs and those similarly situated a Vehicle Sales Price in excess of the advertised price constitutes Bait and Switch advertising practice in violation of the MVAP Regulations at N.J.A.C. 13:45A-26A.4(a) and CFA.

(i) Whether Defendants have a policy or practice of charging Plaintiffs and those similarly situated a Vehicle Sales Price that includes an unitemized pre-delivery service fee in violation of the ASP Regulations, N.J.A.C. 13:45A-26B.2(a)(2) and CFA;

(j) Whether the Defendants committed an abusive or unconscionable commercial practice, or other affirmative act that violates the CFA by charging Plaintiffs and those similarly situated an unitemized documentary fee, overcharging for registration and title fees, charging a Vehicle Sales Price in excess of the advertised price, and or charging an unitemized pre-delivery service fee; and

(k) Whether the Defendants' violations of the ASP Regulations, MVAP Regulations and the CFA in the BO set forth *supra* constitute violations of TCCWNA;

124. The McClures' claims are typical of the claims of the members of the Class which they represent because all such claims arise out of the same policies, practices, and conduct, and

the same or similar form documents used by the Defendants in their dealings with the McClures and each member of the putative class.

125. The McClures will fairly and adequately protect the interests of the class and have retained competent counsel experienced in the prosecution of consumer litigation and class actions.

126. Proposed Class Counsel has investigated and identified potential claims in the action. Proposed Class Counsel has a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

127. The Defendants have acted, or refused to act, on grounds generally applicable to the McClures and all Class members, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

128. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members.

129. A class action is superior to other available methods for the fair and efficient adjudication of these controversies since joinder of all members of both classes is impracticable.

130. The Class, of which the McClures are members, is readily identifiable from the Defendants' records.

131. The McClures do not anticipate any difficulty in the management of this litigation.

132. While the economic damages suffered by the individual members of the class are significant, the amount is modest compared to the expense and burden of individual litigation.

133. A class action will cause an orderly and expeditious administration of the claims of the class and will foster economies of time, effort, and expense.

**<u>CLASS CLAIMS</u>**

COUNT ONE
VIOLATIONS OF THE ASP REGULATIONS AND THE CFA

134. The McClures, on behalf themselves and others similarly situated, repeat and reallege all prior allegations as if set forth at length herein.

135. As alleged supra, the ASP Regulations prohibit the Defendants from charging the McClures and those similarly situated a documentary service fee, unless they first itemize the actual documentary services which are being performed and set forth in writing on the sales document the price for each specific documentary service. N.J.A.C. 13-45A-26B.3(a)(2).

136. The CFA at N.J.S.A. 56:8-2 prohibits:

> the act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise or real estate…"

137. The sales document, the BO, used in the transaction with the McClures and others similarly situated, did not set forth in writing each specific documentary service performed or the price for each specific documentary service that was performed in return for charging the Documentary Fee Paid to Seller.

138. By charging the McClures a $399 Documentary Fee Paid to Seller and charging those similarly situated a similar documentary service fee without setting forth each specific service or the price for each specific documentary service performed the Defendants violated the ASP Regulations at N.J.A.C. 13:45A-26B.3(a)(2).

139. By failing to itemize each service and the price for each service provided as part of the Documentation Fee, the Defendants engaged in an abusive or unconscionable commercial practice, or other affirmative act in direct violation of the CFA at N.J.S.A. 56:8-2.

140. As a direct result of the Defendants' violations of the ASP Regulations and the CFA, the McClures and those similarly situated suffered an ascertainable loss, in the amount of the unlawful documentary service fees each was charged and paid. The McClures' ascertainable loss is the $399.00 they were charged and paid.

141. Defendants also charged the McClures and those similarly situated an amount in excess of the actual official Certificate of Title Fee or similar charges to register and title their RVs.

142. The amounts that the McClures and those similarly situated were overcharged for the "Certificate of Title Fee" or similar charges are documentary service fees within the meaning of the ASP Regulations at N.J.A.C. 13:45A-26B.1.

143. Defendants did not refund to the McClures and those similarly situated the entire amount they were charged in excess of the actual official fees to title and register their vehicles.

144. By misrepresenting the amounts charged by the New Jersey Motor Vehicle Commission (NJ MVC) or other appropriate state motor vehicle agency for registration and title fees and retaining the overcharges, Defendants engage in abusive and/or unconscionable commercial practices, or other affirmative acts in direct violation of the CFA, at N.J.S.A. 56:8-2.

145. The Defendants failed to itemize the services provided and the price for each service that was included in the amounts that the McClures and those similarly situated were overcharged for the "Certificate of Title Fee" in the BO or similar sales document provided to the

McClures and those similarly situated, thereby violating the ASP Regulations N.J.A.C. 13-45A-26B.3(a)(2) and the CFA.

146. The Defendants' violations of the ASP Regulations constitute per se violations of the CFA.

147. As a direct result of Defendants' violations of the CFA and the ASP Regulations, the McClures and those similarly situated have suffered an ascertainable loss in the amount that Defendants charged in excess of the actual official registration and title fees and failed to fully refund. The McClures' ascertainable loss was the $16.50 they were overcharged and not refunded.

148. The McClures and those similarly situated are entitled to treble damages and reasonable attorneys' fees and costs pursuant to the CFA, N.J.S.A. 56:8-19.

COUNT TWO
VIOLATIONS OF THE ASP REGULATIONS, MVAP REGULATIONS AND THE CFA

149. The McClures, on behalf of themselves and other similarly situated, repeat and r4eallege all prior allegations as if set forth at length herein.

150. As alleged Supra, prior to presenting the BO to the McClures and selling the RV with a vehicle sales price of $130,895.00, Defendants represented to the McClures that the actual sales price was $127,975.00.

151. As alleged supra, Defendants sold the RV to the McClures in an amount that was $2,920.00 more than the price represented prior to the sale.

152. As alleged supra the sale of the RV to the McClures at $2,920.00 more than the advertised price constitutes both a direct affirmative act violation of the CFA and a regulatory CFA violation by engaging in Bait and Switch advert rising practices in violation of the MVAP regulations.

153. As alleged supra, alternatively, the sale of the RV to the McClures at $2,920.00 more than the advertised price constitutes both a direct affirmative act violation of the CFA and a regulatory CFA violation by including in the sales price unitemized pre-delivery service fees without itemizing the services being provided or the price for each service in violation of the ASP regulations.

154. As a direct result of Defendants' violations of the CFA, the MVAP Regulations and the ASP Regulations, the McClures and those similarly situated have suffered an ascertainable loss in the amount that Defendants charged in excess of the advertised price, and or unitemized pre-delivery service fees included in the Vehicle Sales Price. The McClures' ascertainable loss was the $2920,00 they were charged.

155. The Defendants' violations of the ASP Regulations and MVAP Regulations constitute per se violations of the CFA.

156. The McClures and those similarly situated are entitled to treble damages and reasonable attorneys' fees and costs pursuant to the CFA, N.J.S.A. 56:8-19.

COUNT THREE
VIOLATIONS OF TCCWNA
(Predicated on violations of the ASP Regulations and the CFA)

157. The McClures, on behalf of themselves and others similarly situated, repeat and reallege all prior allegations as if set forth at length herein.

158. TCCWNA provides, inter alia, that no seller shall enter any written contract or provide a notice that includes a provision that violates any clearly established legal right as established by state or federal law. N.J.S.A. 56:12-14 to -18.

159. At all times relevant to this matter, Defendants were sellers, creditors, and/or lenders with regards to the sale and lease of RVs vehicles within the meaning of TCCWNA.

160. At all times relevant to this matter, the McClures and those similarly situated were consumers within the meaning of TCCWNA.

161. The BO or sales document with similar terms that the Defendants used in the transactions with the McClures and those similarly situated were contracts and/or notices within the meaning of TCCWNA.

162. The Defendants violated TCCWNA by providing the McClures and those similarly situated a BO or similar sales document that failed to set forth each documentary service and the specific price for each documentary service performed that was included in the "Documentation l Fee" or similar charge, in violation of the ASP Regulations at N.J.A.C. 13:45A 26B.3(a)(2) and the CFA.

163. The McClures and those similarly situated have a clearly established legal right to not be charged a fee for documentary services unless each service and price for each service is itemized on the BO or sales document.

164. The McClures and those similarly situated were harmed because they were all charged and paid unlawful documentary service fees in connection with the vehicles purchased or leased from the Defendants.

165. The Defendants also violated TCCWNA by charging the McClures and those similarly situated an unitemized documentary fee that was included in the Registration/Title Fee (Estimated) fees charged for registration and title in the BO and failing to timely provide accurate refunds to the McClures and those similarly situated.

166. The McClures and those similarly situated have a clearly established right to not be charged a documentary service fee that is hidden in the fee for title and registration fees, and a right to either timely receive a complete refund when the amount charged by the Defendants

exceeds the actual amount remitted for registration and title fees or an itemization of the services and price for each service that was included in the overcharge.

167. By failing to provide refunds to the McClures and those similarly situated when a complete refund was owed based on fees charged in excess of the actual official registration and title fees, the Defendants clearly violated the rights of consumers.

168. The McClures and those similarly situated were harmed and are aggrieved consumers because they all were charged an amount in excess of the actual official registration and title fees related to the RVs they purchased or leased from the Defendants and were not refunded for the overcharge or provided an itemization of the services provided for the overcharge and the price for each such service.

169. The Defendants violated TCCWNA by providing the McClures and those similarly situated a BO or similar sales document that included a charge for predelivery services in the Vehicle Sales Price and failed to set forth each pre-delivery service and the specific price for each service performed that was included in the "Vehicle Sales Price in violation of the ASP Regulations at N.J.A.C. 13:45A 26B.2(a)(2) and the CFA.

170. The McClures and those similarly situated have a clearly established legal right to not be charged a fee for pre-delivery services unless each service and price for each service is itemized on the BO or sales document.

171. The McClures and those similarly situated were harmed because they were all charged and paid unlawful pre-delivery service fees in connection with the vehicles purchased or leased from the Defendants.

172. The ASP Regulations, and the CFA were clearly established laws at the time the Defendants sold or leased RVs to the McClures and those similarly situated.

173. By offering and/or entering into written consumer contracts (the BO or similar sales documents) which contain provisions in violation of consumers' legal rights clearly established by the ASP Regulations and the CFA, the Defendants violated the TCCWNA at N.J.S.A. 56:12-15.

174. For violations pertaining to the BO or similar sales document, the McClures and those similarly situated are entitled to statutory damages of not less than $100 plus actual damages, attorneys' fees, and costs pursuant to N.J.S.A. 56:12-17.

COUNT FOUR
DECLARATORY JUDGMENT PURSUANT TO THE UNIFORM DECLARATORY JUDGMENTS ACT (UDJA)

175. The McClures, on behalf of themselves and others similarly situated, repeat and reallege all prior allegations as if set forth at length herein.

176. The UDJA provides that a person interested under a ... written contract or other writing constituting a contract, or whose rights, status or other legal relations are affected by a statute ... [or] contract ... may have determined any question of construction or validity arising under the instrument, statute ...[or] contract ... and obtain a declaration of rights, status, or other legal relations thereunder. N.J.S.A. 2A:16-53.

177. The BO or similar sales document the Defendants provided the McClures and those similarly situated is a contract as contemplated by the UDJA. N.J.S.A. 2A:16-50, et seq.

178. The BO or similar sales document the Defendants provided the McClures and those similarly situated violated the ASP Regulations, CFA, and TCCWNA, as set forth in the First and Second Counts above.

179. The Court should enter a declaratory judgment that the Defendants' BO, as set forth in the First, Second and Third Counts above, violates the ASP Regulations, the CFA, and TCCWNA.

180. The Court should enter a declaratory judgment enjoining the Defendants from future violations of the ASP Regulations, the CFA, and TCCWNA and requiring the Defendants to correct their BO and practices that violate the ASP Regulations, the CFA, and TCCWNA.

## **INDIVIDUAL CLAIMS**

### COUNT FIVE
### CONSUMER FRAUD ACT

181. The McClures on behalf of themselves only repeat and reallege each and every allegation in the forgoing paragraphs as if fully set forth herein.

182. When Defendants sold the RV to the McClures on August 5, 2025, they had actual knowledge of the recall notice that was issued as to the RV.

183. When Defendants delivered the RV to the McClures on August 11, 2025, they had actual knowledge of the recall notice that was issued as to the RV.

184. When Defendants sold and delivered the RV to the McClures they knew or had reason to know that the RV had defects, such as the fuel line extension and its associated recall, the motor issue with the slide outs, and the generator issue.

185. When Defendants sold and delivered the RV to the McClures, they misrepresented the RV to be in good, merchantable quality, free of defects, when it was in fact not.

186. When Defendants sold and delivered the RV to the McClures, they knowingly concealed, suppressed, or omitted facts that were material to the transaction, including but not limited to the RV's defect and recall notice, and other mechanical problems with intent that the McClures rely on the concealed, suppressed, or omitted material facts.

187. When Defendants sold and delivered the RV to the McClures, they had an affirmative duty to not sell or deliver the RV to them in its dangerous defective condition.

188. When Defendants sold and delivered the RV to the McClures, they had an affirmative duty to disclose the recall including the dangerous condition and that there was no fix for the condition of the RV identified in the recall notice.

189. When Defendants sold and delivered the RV to the McClures, they had an affirmative duty to disclose the other mechanical issues associated with the RV and not sell the RV with those existing conditions.

190. When Defendants sold the RV to the McClures, they misrepresented to the McClures that if they stopped paying the loan, the finance company would take the vehicle back and not go after them for the loan balance.

191. When the McClures, found out about the recall on the RV, the dangerous condition of the RV and that there was no fix for the issue it created, they contacted Dylans and requested that Defendnats take back the RV and cancel the deal.

192. At the that the McClures requested that the transaction for the purchase of the RV be cancelled, The Defendants had actual knowledge of the recall, the dangerous condition of the RV and that there was no fix available for the defect.

193. When the McClures became aware of the dangerous defective condition of the RV with no fix available, the Defendants had a non-delegable duty to accept the recission, rejection or revocation of acceptance requested by the McClures.

194. Defendants refused to cancel the deal and take back the RV.

195. The McClures request that Dylans take back the RV was valid, recission, rejection and or revocation of acceptance.

196. The McClures have been unable to use the RV due to its defects and dangerous condition.

197. The commercial practices exemplified by the Defendants in this consumer transaction were unlawful and constituted affirmative act violations of the CFA including that the practices were unconscionable, abusive, deceptive, fraudulent and misrepresentations.

198. The commercial practices exemplified by the Defendants in this consumer transaction were unlawful and constituted the knowing concealment, suppression, or omission of material facts with intent that the McClures rely upon such concealment, suppression, or omission.

199. But for the misrepresentations and knowing omissions of the Dylans' defendants, the McClures would not have purchased the RV.

200. As a direct result of the unlawful acts committed by Defendants, the McClures suffered and continue to suffer ascertainable losses.

201. The ascertainable losses include but are not limited:

- All money paid towards the purchase of the RV:
- All money paid for improvements to the RV;
- All money paid for the purchased of items to enhance the RV:
- All money paid to repair and maintain the RV including winterization of the RV:
- All money paid for and continued to be paid for the loan payments on the RV
- All money paid and continues to be paid to maintain insurance on the RV; and
- The diminished value of the RV at the time of sale.

COUNT SIX
COMMON LAW FRAUD

202. The McClures repeat and reallege each and every allegation contained in the forgoing paragraphs as if fully set forth herein

203. The some or all of the Defendants misrepresented and intentionally concealed material facts regarding the transaction as fully described in the above paragraphs.

204. For example, they said the vehicle was "top of the line," better built, and good, even though there was a recall notice out regarding an issue involving the fuel line.

205. They also knew of the fuel line issues as the recall notice, upon information and belief, was in their possession on the date of sale.

206. They also knew about the motor issue for the slide outs, as the mechanic had advice regarding how to address it which the mechanic volunteered to the McClures.

207. They also knew about the part missing from the generator, as the mechanic suggested it was common practice to take generator parts from other vehicles in the dealership's possession to fix the generator issue.

208. They also knew, or had reason to know, that M&T would not merely abandon a claim for damages against the McClures or their family if the terms of the finance agreement were breached.

209. The some or all of the Defendants, including Dylans, Helms and Andy, made representations praising the "top of the line" quality of the RV, along with omitting these material and dangerous defects, and the representation regarding how M&T would pursue in order to induce the McClures into purchasing the RV.

210. The representations that Defendants made concerning the RV were express warranties.

211. The Defendants had a non-delegable duty to not sell or deliver RV to the McClures in its defective and dangerous condition.

212. The Defendants had a non-delegable duty to disclose the actual condition of the RV at the time of sale, at the time of delivery and thereafter.

213. Once the McClures became aware of the dangerous defective condition of the RV the Defendants had a non-delegable duty to accept the recission, rejection or revocation of acceptance requested by the McClures.

214. The Defendants breached their non-delegable duty to disclose the actual condition of the RV at the time of sale, at the time of delivery and thereafter.

215. The McClures reasonably relied on all of the representations, misrepresentations and knowing omissions made by some or all of the Defendants.

216. The McClures suffered and continue to suffer actual damages as a result of their reliance on the representations, misrepresentations and omissions made of the Defendants.

217. The Defendants actions toward the McClures regarding the sale of the RV to them, the delivery of the RV to them and thereafter were malicious, reckless and or demonstrated a wanton disregard for the safety of the McClures and the RV.

**WHEREFORE**, the McClures on behalf of themselves and those similarly situated demands judgement against the Defendants jointly and severally as follows:

**As to the class claims in Counts One through Four**

a. For an order certifying this matter as a class action on behalf of the Class, pursuant to R. 4:32-1(b)(2) and (b)(3);

b. For an order appointing the named Plaintiffs, Eugene McClure and Anna Mae McClure as the class representatives, and appointing their attorneys Andrew R. Wolf, Esq., Henry P. Wolfe, Esq. and Javier L. Merino, Esq. from The Dann Law Firm, PC; and Aaron Harmaty from The Law Office of Aaron M. Harmaty, LLC as Class Counsel;

c. For injunctive relief forbidding the Defendants from future violations of the CFA, TCCWNA, MVAP Regulations and the ASP Regulations;

d. For declaratory judgment that the Defendants violated the CFA, TCCWNA, the ASP Regulations and the MVAP Regulations;

e. For injunctive/equitable relief requiring Defendants to provide notice to all class members of the Plaintiffs' claims and the relief provided by the Court;

f. For treble damages under the CFA, N.J.S.A. 56:8-19 for the Plaintiffs and each member of the Class;

g. For statutory damages of a minimum of $100 under TCCWNA at N.J.S.A. 56:12-17 for Plaintiffs and each member of the Class;

h. For reasonable attorneys' fees and costs, pursuant to the CFA at N.J.S.A. 56:8-19 and TCCWNA at N.J.S.A. 56:12-17;

i. For prejudgment and post-judgement interest; and

j. For all other relief as the Court deems equitable and just

**As to Plaintiff's Individual Claims in Counts Five and Six**

k. For declaratory relief that Defendants violated the CFA and committed Common Law Fraud;

l. For injunctive relief requiring Defendants to comply with the CFA;

m. For treble damages under the CFA pursuant to N.J.S.A. 56:8-19 for the individual claims as to the Defendants;

n. For reasonable attorneys' fees and costs, pursuant to the CFA at N.J.S.A. 56:8-19 as to Plaintiffs' individual claims;

o. For actual damages as a result of Defendants' Common Law Fraud perpetrated on Plaintiffs for their individual claims;

p. For incidental and consequential damages as a result of Defendants' Common Law Fraud perpetrated on Plaintiffs for their individual claims;

q. For equitable relief requiring Dylans to repurchase the loan from M & T Bank and relieving the McClures of any and all responsibility to paying off the loan created by the Defendants' fraudulent activities;

r. For punitive damages as a result of Defendants' egregious conduct in committing the Common law fraud perpetrated on Plaintiff for his individual claims;

s. For pre-judgment and post-judgment interest; and

t. For all other relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

The Plaintiffs demand trial of this action by jury.

## NOTICE TO ATTORNEY GENERAL OF THIS ACTION

A copy of this Amended Complaint shall be electronically mailed to the Attorney General of the State of N.J. within 24 hours after the filing of this Complaint with the Court pursuant to N.J.S.A. 56:8-20.

## DEMAND FOR DISCOVERY OF COMMERCIAL GENERAL LIABILITY INSURANCE COVERAGE AS REQUIRED BY N.J.S.A. 56:8-142

Demand is made under Rule 4:10-2(b) that Defendants disclose to Plaintiffs whether or not there are any insurance or indemnification agreements or policies as required by N.J.S.A. 56:8-142 and N.J.A.C. 13A:45-17.12 under which any person or firm carrying on an insurance business may be liable to satisfy part or all of the judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Javier L. Merino, Esq., Henry P. Wolfe, Andrew R. Wolf, Esq., and Aaron M. Harmaty, Esq. are hereby designated as trial counsel for the Plaintiffs in the above matter.

## CERTIFICATION: RULE 4:5-1

I certify that to the best of my knowledge that the matter in controversy is not the subject of any other action pending in any court or the subject of a pending arbitration proceeding, nor is

any other action or arbitration proceeding contemplated except that Plaintiffs may bring a New Car Lemon Law claim against Forest River, the manufacturer of the RV.

The Law Office of Aaron M. Harmaty
Attorneys for Plaintiffs and those similarly situated

Dated: February 2, 2026

*Aaron M. Harmaty*
Aaron M. Harmaty, Esq.

The Dann Law Firm, P.C.
Attorneys for Plaintiffs and those similarly situated

Dated: February 2, 2026

Andrew R. Wolf, Esq.